May it please the court. Can everyone hear me? Yes. Thank you. Thank you. May it please the court. I'm Seth Hopkins and I represent the appellant officers and I respectfully request five minutes for rebuttal. Yes, you say five minutes for rebuttal. This case is about the police's efforts to help the Gorskys and the Kozmans, two neighbors who hated, harassed and threatened each other based on their religions, ethnic origins and personal animosity. Their feud resulted in 198 pages, 97 pages of official police reports over three years. And the question before this court is whether four officers are entitled to qualified immunity for their efforts to investigate a crime and issue no trespass orders after receiving two emergency calls in one night. After briefly addressing the facts, I'll cover each of our issues for review. First, I'll address the fact that while courts normally accept facts in favor of a non movement and a qualified immunity summary judgment, in this case, portions of the Gorsky's affidavits should have been excluded, which would have immediately disposed of this case. Second, even with the affidavits, Corporal Riveau and Deputy Guajardo were entitled to qualified immunity for arresting Mr Gorsky because they had probable cause to do so under Texas Penal Code Section 3815. Third, the officers in this case were also entitled to qualified immunity under the Gorsky's unlawful entry claims because they received permission to enter the house. And finally, the officers are entitled to qualified immunity on the Gorsky's excessive force claims because the force they used was reasonable. Mr Gorsky admits he was not injured and officers had no notice that they were causing injuries. To turn briefly to the facts, the Gorsky's and the Cozman's hated each other. They threw apples and dog feces in each other's yards, posted religious messages directed toward one another, stood on ladders to film each other and the Gorsky's even taunted their neighbors with Nazi salutes and goose steps. On the night of February 20th, 2016, the Cozman's called police for help twice. On their first visit, Mr Gorsky brandished a large stick at officers who were able to diffuse the situation without even writing a ticket. On the second call, the Cozman's showed officers a video of Ms Gorsky egging her car in retaliation for the first call that the officers received. The officers realized that that night they had to issue no trespass warnings and talk to both neighbors. They turned on their audio recorders and things went smoothly with the incident. Mr. Gorsky answered the door drunk, belligerent and in his underwear. He promised to get his wife but tried to close the door after a few questions. Did you say that these officers had probable cause to effect arrest when they walked up to the front door before anything else transpired? At that, well, probably so, yes, your honor, because there was, there was video of them. They have probable cause. Um, ordinarily an officer can arrest, uh, that can arrest for conduct that's not within his presence. Um, and you'd normally have to get a warrant to go do that. So when you're arguing probable cause, what you're talking about after the events went down, when they went up to the door, did they have probable cause at that time? At a minimum, they had the right, they weren't actually trying to arrest Ms. Gorsky and we didn't get to that, that question or that point. At that point, they just wanted to, I'm just trying to say when you, when you say you've got probable cause, when you walk up to the door, I assume we would agree that they did not have probable cause to arrest based on a, on a phone call from the, uh, report of some kind. I would agree with that. Yes, your honor. At that point, they were simply trying to talk to the Gorskys and not effectuate an arrest. The, um, what, what came later, what transpired later was when Mr. Gorsky interfered with their, their attempts to talk to Ms. Gorsky. So did they have any, any, any right to make any entry into the house, the home itself? Not a right to make, no, your honor, just, just a right to, to, to talk, to knock, to investigate, to, to, to ask some questions. At 3.30, 3.30 in the morning. Yes, your honor. That, that's, uh, that's when the crime was committed. All right. Okay. Um, so officers knocked on the door, Mr. Gorsky came out, um, in his underwear, they had words and, um, and that's how the incident began. Um, ultimately the officers left after about 45 minutes, they had their discussion. No one was arrested. Uh, no trespass warnings were issued, which was their, their obligation that night at a minimum. And the Gorskys later claimed they were subjected to unlawful search, um, you know, excessive force and, um, unlawful arrest. Is there, is there a factual dispute as to at what point an officer entered the residence and also whether that officer had consent or is there, is there a factual dispute as to either or both of those? That's, that's our first issue. And that's our evidentiary issue. Um, and so, you know, normally in summary judgment, if there's a factual dispute, you resolve it in favor of non-moving party. However, there are two exceptions to that. Um, first party can't sign an affidavit to defeat summary judgment, if that impeaches his own sworn testimony, unless he provides an explanation. And second, a party can't defeat summary judgment by signing an affidavit that so contradicts the record that no reasonable jury would believe it. Are you, my, my, my question, let's get back to that. My question was, is there a factual dispute as to either of those issues? Number one, when the officer entered the residence and two, whether and when there was consent. We contend there's not. The, the only dispute would be if based upon the, the affidavit that was signed by the Gorskys, but that affidavit so contradicts the audio transcript and so contradicts their own earlier interrogatory responses. We contend it should have been thrown out and that's our first evidentiary argument. But, but you've got a problem with that on a qualified immunity appeal. Once the district judge has identified a genuine disputes of material fact. Well, again, if, if the affidavit was thrown out, everything would be resolved. But even if we only go to the issue of the, the second, the, the officer's entry into the home, it wouldn't go into excessive force or anything else. We've got numerous issues, but if the affidavit were accepted and we were to allow the affidavit to contradict the interrogatory responses and contradict the audio, then we do have a problem with respect to the, the unlawful entry. We can see that point, but not with respect to the other issues, the unlawful arrest and the excessive force. We, the affidavit doesn't help them with that. So the, the two reasons why we argue that the affid, when we have a case like this, there's sort of a two tiered response, a two tiered analysis. First of all, the court of appeals looks to the affidavit and tries to determine whether or not it was properly admitted. And then second, it looks to the summary judgment is, you know, as a de novo review. And the problems that we have with the affidavit are first of all, on page 1075 of the record, Ms. Gorski signed and has sworn interrogatory where she stated, quote, two or three deputies were on the front porch of my house. When I came to the front foyer of the house, if we accept that interrogatory is true, that's sworn interrogatory. And we listened to the audio tape. It's very clear that the officers had permission to enter the home before they entered the home. And that inconsistency has never been explained. And we, we cite some cases, the Hackett case, the Hacinda records case, the Doe versus Dallas case, where circumstances much more innocuous than that, where the affidavits were stricken. And Ms. Gorski had a 180 degree change in her testimony. That's never been explained. The second problem is that the audio tape so no one is your argument there that we should adopt the Supreme Court's statement about use of video. I don't think they've ever extended that to audio. The Supreme Court hasn't, but this court has in Lewis versus city of Shreveport last year. In the first footnote, there was a situation where this part stated, listen to audio record. And there was a question about whether or not a suspect was in the audio record. We contend that the suspect was resisting. So it has been extended to audio though, although admittedly in a footnote and I would argue that all the senses are important. And a lot of the time audio will capture things that video won't. It captures from all sound from all directions, whereas video, you know, is only from one direction. Video can be out of focus and audio can be very valuable. And certainly we encourage our officers to use audio. And it does when they do the right thing and they record the audio, but then the courts don't listen closely to it. It sort of sends the wrong message. So we would ask that the audio be very carefully listened to. And that if the audio does contradict the record, you have a transcript of the audio. Yes, your honor. We have a transcript in the record. I cited it. And we also it's page 637 is where we actually filed the multimedia, but there's also a transcript. Yes, your honor. So what we hear in the audio is that two minutes and 12 seconds into the recording, Mr. Gorski has already been handcuffed on the porch. We hear Corvo knock on the front door and announce twice, police department. 10 seconds later, he tells Ms. Gorski, come on out. Her voice gets louder. She comes out. We can hear her being handcuffed. No officer went to Ms. Gorski. Ms. Gorski came to them. That's very clear from the audio. They talked for a while at four minutes and 20 seconds. The parties discussed the fact that Ms. Gorski's son was in the house and Corporal Reveaux asked her if he's asleep. He didn't ask the question. As I read the transcript, it was apparent that there was a large language barrier here. She's Russian. She had difficulty communicating, kept asking why, what's going on, I don't understand, I don't understand. And she later had difficulty in later proceedings, which were not under stressful circumstances, still was a language problem. So we're talking now about three-thirty in the morning with a woman that's been summoned out of the bed, who has serious problems communicating and understanding outside of Russian. Is that a fair reading of that? I don't know. I'm not trying to argue about it. I'm just trying to get a perspective of it. But I was taken aback by her language, one of language facility here. Your Honor, you're very correct. There was a language barrier. But of course, when we examine qualified immunity, it's from the perspective of a reasonable officer, not the perspective of Ms. Gorski. So the question is, when she said, yes, yes, when they asked if they could enter the house from a reasonable officer, from his perspective, regardless of a language barrier, that was consent. And certainly there's no clearly established law that would say you can't enter under those circumstances. So we hear the officers enter. After Ms. Gorski gives permission for the first time, we hear a lot of footsteps, about 15 seconds worth of footsteps as all of the officers come inside. And then we hear the front door closing. How many officers were there now? You had one officer in training, learning the ropes, I guess. But so how many officers now are there? So we have one officer with Mr. Gorski in the car and we have three officers at the front porch. So there would have been three officers out there. Yes, Your Honor. That's for us. Okay, I got it. So we hear these and contradicts her affidavit. And the district court acknowledged that Ms. Gorski gave consent for the officer to come in, erred in accepting her new claim that they were already inside the house when they asked to come inside the house. The second evidentiary question we had was we asked the office, we asked for portions of the Gorski's affidavits to be stricken where they claimed to have screamed in pain and call profanities thrown into a chair while being handcuffed. Well, there were two audio recorders, one on Mr. Gorski, one on Ms. Gorski. They captured the entire interaction. They captured even the distinct sound of handcuff clicks. At no time does anyone scream in pain, complain they're hurt, call profanity, or are asked to have their handcuffs loosened. No reasonable officer could have had any awareness of any injury being caused to the Gorski's. And at deposition on page 3393 of the record, Mr. Gorski admitted he suffered no injury, and the only discomfort he even had was because of how he positioned himself in the patrol car. So our audio is the most objective evidence we have in this case. We should encourage officers to use it, and we should listen closely to it. So that's our first issue. But even if we lose the first issue, there's still qualified immunity. The second issue for review is that the district court erred in denying qualified immunity for Mr. Gorski's unlawful arrest claim. So officers detained Mr. Gorski and threatened to arrest him for violating Texas Penal Code 3815, which makes it a crime to interrupt, disrupt, impede, or otherwise interfere with a peace officer performing a duty or exercising authority imposed or granted by law. Now this is an incredibly broad statute in Texas. It requires the lowest culpable mental state. And officers were at the Gorski's house again for the second emergency call for the night. And they, when Mr. Gorski opened the door and they asked, can you bring your wife? We need to talk to her. He agreed. You know, he said five times, I'm going to get my wife. The disagreement occurred when he wanted to close the door and leave them out front while he went and got his wife. Their concern after their previous interaction with Mr. Gorski is he might have a weapon inside. We don't know what's going to happen. So he took the right at that point to insist, no, you've, you've agreed to this interaction. You've got to keep the door open while you get her. And when they, when he refused to do that, became belligerent, then, then under the statute, they had probable cause to arrest him for interfering with their, their duties. That's the first time I've witnessed this whole transaction that you mentioned the word probable cause. Yes, your honor. So they never had probable cause to go make this arrest. And when they did call the DA, they told him to go home. Well, they, they were just investigating the claim and issuing no trespassing. We're going to arrest him, bring him in. They called the DA. Yes, your honor. That's, that's correct. So now we're talking. So, so now we're talking about Mr. Gorski and they did, again, these officers did everything right from turning on their audio tape. They, the next thing they did is they, they called the DA's office and they said, we want a formal, we want your legal advice. Should we take him in? Again, this is what we want our officers to do. We want them to get this kind of advice in the field. And it's, it's wonderful that he did that. The, the DA said, we believe there's probable cause, but, but use some discretion. Don't, don't do that. Don't arrest Mr. Gorski. They followed that advice. You know, and, and it's also important to understand that, you know, they, so it's undisputed that all of this up until these facts are undisputed. And it's also important to understand that under clearly established law in Texas, they had probable cause to conduct their arrest. Oh, am I had a, I'm sorry, am I out of time? Oh, I'm sorry. I apologize. I didn't realize I was out of time. All right. You, you were, you were answering the question. That's, that's not a problem. And you saved a time for rebuttal. Thank you, Mr. Hoffman. Thank you, your honor. Kalanen. May it please the court. I am Randall Kalanen and I represent Olesa and Jacob Gorski. And the honorable chief judge Lee H. Rosenthal looked at all of these facts. And if you look, if we look into her judgment, her well-reasoned 41 page judgment, you will see that she considered all these these questions and about credibility and so forth and decided that the issues that remain still remain and qualified immunity was defeated. But I think. Where are the genuine issues of material fact as to the arrest and excessive force? I'm only asking you about arrest and excessive force. Well, Mr. Gorski had committed no crimes, was not suspected of any crime. This concept of the crime of what was that crime? Yeah. Interference with public duties. First of all, the DA rejected it. Now it's a fact issue, an issue of credibility, whether what somebody said something on the telephone makes that makes the difference. However, 3815 of the Texas Penal Code, it specifically says speech only is a defense. Furthermore, the act has to be done with criminal negligence, not just mere. I thought I thought he was I thought he was more or less blocking the door or keeping the officers from having access to his wife. No, that that is incorrect, Your Honor. He specifically said and the other side and the opposing counsel, he's even stated that he agreed to go get his go get his wife. But her wife, the wife was upstairs and apparently he didn't want these officers just to have an open door to come in and do whatever they wanted to do. My client, by the way, Mr. Gorski, has never been convicted of a crime in all 63 years of his life. Mr. Calhoun, you and I both know that that has nothing to do with what we're deciding here. What we're deciding here is what happened that night. Yes, that's correct, Your Honor. And so there was no probable cause that any crime was committed by Mr. Gorski. And we also have to look when it comes to excessive force on these issues. What was the crime that was alleged? Well, first of all, Miss Gorski, when she was confronted with this concept that she had put some eggs upon the car, said no, because and she identified her friend, Irene. And they say to this day that that person on the video is Irene, who was visiting and she did that. And that's what she said immediately. Now, this particular crime is important because if there was a crime, the crime accused is class C criminal mischief, which the officer admitted, Officer Rabot, I think it had zero damage to it. So not only was it the class C, which is criminal mischief, zero dollars to against $50, but then it was zero dollars. So this was the most insignificant of all crimes that are imaginable. So there was no probable cause at any time, either for the arrest of Mr. Gorski or Mrs. Gorski. And it is correct that their second language is Russian, and so forth. And these kind of issues of second language and and who meant what by what? First of all, there's no real direct contradictions. Everything can be reconciled as the judge think, as Judge Rosenthal painstakingly did reconcile all these differences that were already brought up. All these things are critical counsel. There's a there's also an element that the state legislature put into the statute, especially talking about free speech. But that free speech in response to the arrest situation came to the Supreme Court, but it also came through our court. In terms of when an officer is effecting an arrest that people are entitled to challenge his cause, whatever, whatever it gets over. So there is a I'm not suggesting that exactly what the role that plays here, but I'm suggesting to you is that not responding to officers in terms of asking you to do things, etc. And so we're going to challenge them. First off, ordinarily enjoys a free speech thing. And I don't know where that how that plays here in your argument or not, but I haven't heard much talk about it. Yes, Your Honor, you're correct. As a matter of fact, the that free speech element is one of our strongest rights. And it's right. It's built right in to the interference law, because right in the interference law, it says speech only is a defense to this particular statute. And that was out of I believe that was from the case of Hill versus the city of Houston that went to the Supreme Court is when the Texas legislature then then created that particular element to interfere. Anyway, suffice it to say that the free speech is built right into that law. And it doesn't say nice speech only. It doesn't say agreeable speech only. It says speech only. And by the way, Mr. Gorski was always respectful until he got, you know, until excessive force was used on him. Then he then he made complaints and never, you know, resisted ever. So what we have here is there was no probable cause that any crime had been committed. What do you say about the consent to enter point? There was no consent to enter. And at no point was there ever any consent to enter. As a matter of fact, that's why Mr. Gorski wanted to close the door is probably because he didn't want the individuals to get in. That's an expression of Hey, you can't come into my house. Will I go get my wife? Yes, I will go get my wife even though I don't have to. Although it's three in the morning. Although all you're you're accusing her of is a class C misdemeanor, you could just give me a ticket or give her a ticket and she don't have to wake her up in the middle of the night. And plus, it wasn't even her. It was her friend, Irene, which is clearly shown on the video. So basically, and if you got to remember also that Mr. Revo, the guy in charge, he was he was disciplined. He was disciplined for the activities that night. And, you know, not to be a skeptic, but that's hard to do sometimes to get a discipline from your own police agency for, you know, messing up. So he should have taken control and done a much better job, according to the Internal Affairs report of his his activities. So what we see here is individuals that were going overboard. I'm trying to get back to excuse me for this remote video. It's sort of hard to interrupt. But I'm getting back to what is the disputed issue of fact as to whether Mr. Gorski was impeding the officers in terms of having access to his wife. I'm not talking about the issue of law. I'm talking about what happened on the scene. I don't I don't see that there's a dispute there as to what happened in regard to getting the wife to the front door. Right. Well, he agreed to go get the wife to the front door. He agreed to it. And even the opposing side has agreed. But the disagreement, as I understand it, was that the officers insisted that he not close the door on them while he went to get his wife. Is that fair to say or not, from the record? Oh, if you believe if you make a credibility determination at this point, I disagree that that's what they were doing. And so, Michael, that's up to up to what what the jury will decide on that issue. As a matter of fact, you know, lots of case law where it says that when it comes to law enforcement, ultimately, the testimony of the officer will be in his his favor. And they're also interested witnesses. So we claim that that is not what was in their mind. They were they were wanting to see look inside for other reasons. So we we believe that's up to a jury to decide. Actually, so what we do, though, is we look at the record on appeal to see whether a disputed issue of whether there's a disputed issue of fact, was the traffic light red or was the traffic light green? One side said it was green and the other side doesn't oppose that with any with any evidence, then it's not a disputed fact. So my question is, and this is important, so I'm spending some time on in regard to getting the Mrs. Gorski to the front door. Is there a dispute as to who said what or who did what? A disputed fact you've already raised, not something that you might eventually want to raise at trial? Yes, Your Honor, I believe that the fact issue was very clearly. If I could quickly turn to the judge's opinion. Well, you can look at whether there's a dispute about whether when consent was given before or after they entered the place. I read the transcript. There's a dispute about that narrow point that helps you and they put in the door in the transcript. You'll find where there's a statement about the police officer holding his foot in the door. Yes, well, what we have here and what the court has, the district court judge mentioned is that in page 18 of Her Honor's opinion, it says that the undisputed evidence or the evidence viewed favorable to the non-move on shows that Deputy Guajardo told Mr. Gorski that if he hinders investigation, they could get in his house, put him in handcuffs and take him to jail. Mr. Gorski responded by telling Mr. Guajardo to handcuff him, but Corporal Lowe asked Ms. Gorski, he wanted to call for his wife and tell her that he is going to jail. And he says, yeah, your husband's going to jail. So that actually goes to the arrest issue regarding the warrantless entry. Yeah, that goes to the arrest. All right. And there's no factual dispute about what you just read. So we can take those facts as given for purposes of the legal question regarding the arrest. Isn't that right? Oh, no, these are just things that were that the other side stated. Those are what they were actually thinking. And just because the other side says I can do this does not make it so. There was never any reason to arrest Mr. Gorski. Well, on the summary judgment, when the other side comes up with evidence, you're responsible for coming forward with evidence, which can certainly be in the form of affidavits or depositions or interrogatories or anything else to dispute that. But the facts, as you just gave us, it sounds to me like are undisputed statements of raw material fact. OK. And it goes to the question of the arrests as well as to the illegal entry. I'm mainly focusing on the arrest. Your Honor, if I will, the if I may, the district court judge clearly pointed out from the evidence in the in the in the in the her opinion that. It's clearly set forward. And. Thank you. In the record on appeal at three, five, six, nine at suite. The judge points, the trial judge points out that. Yes, on page 3572, the court goes through their set of evidence that they used to determine that there was an unlawful arrest. And also they talk about Texas penal code 38.5. All right, so that's a question of law that we can decide on this appeal if there's not a disputed issue of material fact as to that specific question, which is the. This is an individual's house and they're the end of it. The police were beyond the threshold when they're with their foot in the door. All right, that has to do with the illegal entry, doesn't it? Well, here here's here's what the fifth the Fifth Circuit has held in Freeman v. Gore, as her honor pointed out, that probable cause does not exist under section 38.15. When an officer acts without legal authority by attempting to enter a home without a warrant. So what we have there is that's exactly what they're doing. They had no warrant and they had no evidence in circumstances. Let's take a hypothetical. I understand this is a hypothetical, not the facts of your case. Let's assume that these officers had busted the door open without permission and went in there and Mr. Gorski was in the living room. And once they were in there, they saw him commit a crime such as assaulting somebody or setting something on fire or some other obvious act of a criminal nature. They, of course, could arrest him for that, even though they were in my hypothetical unlawfully inside the house, isn't that right? That that is true, your honor. However, that is not close to the facts we have here. This was addressed in Freeman v. Gore, your honor. And in Freeman v. Gore, as clearly pointed out by her honor, it says that under this particular law, 38.15, when an officer acts without legal authority by attempting to enter a home without a warrant or a basis to enter without a warrant. And in Freeman v. Gore, police officers attempt to enter a plaintiff's house without a warrant to search for her son. So basically the court, district court, on that basis determined that there was not probable cause under that particular statute. And that's ROA 3574. I would like to point out one thing in regard, which I think is very telling. And that is, her honor had to do a lot of evidentiary decisions and so forth. And she did a great job, of course, in our opinion. And so if we look at record excerpt number eight, record excerpt number eight, that was It is stated that in the record excerpt, I just have to reach over for the, that number eight says that Ms. Gorski's physician concluded that her bruises are either self-inflicted or caused by her antidepressant medication. However, when you actually look at the one piece of paper, we see that that piece of paper, that medical record is 44 days after this event. And we're talking about bruising. Furthermore, the doctor said something that it may be the Paxil that's causing the bruising. But if you look at the complete medical record, which is four pages, not just the one page, we see that that particular doctor also started the Paxil or noted the Paxil was started after this incident. So we see this sort of thing, which the her honor looked at very carefully and saw all these evidentiary matters. She did a great job. And I do not think that they should be disturbed on any one of the particular issues. And she's certain and her honor did not abuse her discretion. All right, thank you. Thank you, Mr. Thank you very much. Mr. Hopkins, you save time for rebuttal. Yes, your honor. As Judge Smith alluded to, probably the easiest issue to resolve in this case is the unlawful arrest case. And that's because there is so much clearly established Texas law establishing that there would be probable cause to arrest Mr. Gorski under these circumstances. The cases we cited, the Voss case, police went to a house at midnight after reports that a teenager may be thinking about suicide. The girl's mother would not let the girl get into the patrol car with the officer, and she was detained, put in the patrol car. She sued for wrongful arrest. The court held the officers had probable cause under Section 3815. That Voss case extends a long line of similar cases. Pearlman versus city of Fort Worth, the Childers case. They all say similar things. The district court relied on one case, Freeman versus Gore, which we just talked about and the opposing counsel just talked about. But that case is really distinguished. Police knew they were executing a warrant at the wrong house. They were told that. They were told that the person they were looking for wasn't there. And they still demanded to search the wrong house and arrested. Definitely. We'll start with the premise that they, as a matter of law, these people did not have probable cause to effect an arrest when they knocked on the door and they enter it. You cannot create probable cause by an argument, by people who are arguing with you and say, et cetera, et cetera, their language and whatever else that won't get it. You have more than that, I think of here. In other words, I'm not sure when you find probable cause in this transaction, as I listed your argument. When did they get probable cause? Well, I think the premise when they knock on the door, though, they they weren't looking to arrest Ms. Gorski. They certainly have the right probable cause or not. I understand that. My question is, did they have probable cause? Whatever they were planning to do, did they? They're there at three o'clock in the morning, knock on the door and they don't have probable cause to effect an arrest. And now we start from there. When in this, in the events that followed, do you say that they required probable cause? Certainly they refused to when he refused to go get his wife. Yes, your honor. And with respect to this, because this Gorski doesn't have an unlawful arrest claim, Mr. Gorski does. And at that point, there was probable cause to arrest Mr. Gorski under clearly established Texas law. OK, what do you do with the qualification of that that you have to cooperate with a police officer that that presupposes that that he has a right at that at that juncture to undertake it? If he has no probable cause, the argument would be, well, you also don't have a right to order him to go do something else either. Well, the Voss case, the Childers case, all of those cases were similar. There was I mean, Voss case was a welfare check. There was no probable cause for the officers to be there. They just wanted to check on a suicidal teenager. And then there was probable cause to arrest the mother when she probably calls in those cases were were conduct and acts of the person that's arrested that that creates probable cause. I mean, obviously, if you walk up to a place like the police officer walks up to you on the street and talking to you, you don't have to say anything. But if you if you if you ask you to do something and you turn around and hit him or something, you can create probable cause. I'm just trying to I'm not arguing with you. I'm trying to get the once you once you say there's no probable cause when they go up there, then you you have to dissipate that at some point. You would say you acquired it. And I don't say that I'm not hearing anything from you as to what they did. You know, you presuppose that he's obligated, although we have no probable cause to be there, to go get his wife. And he refused to do that, at least presumably so, and that is probable cause of arrest. Well, the issue is when he opened the door again, very similar to Childers and Voss and all of those other cases, when he opened the door and agreed five times to get his wife, he created a scene. In other words, that that was an active scene that the police officer were controlling. If he had said if he had just slammed the door in their face and said, I don't want to talk to you, goodbye. The facts of the case. But he had his foot in the door. That's one of the little fact questions. They said, you know, we're not closing the door. What do you do with that? When that that's not an issue on appeal, though. I mean, that the court found a statement that's relevant to the argument you're making. But in all right, I just I'm just trying to get a picture of what happened there. I get a conflicting. I'll read the record again. And these are good questions. And I'm sorry I ran out of very good questions. These are difficult issues. And I respect both of you as advocates. I don't. I'll just try to try to sort through it. Thank you, Mr. Hawkins. Your case is under submission. Thank you. Thank you very much. Honors.